UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

HAROLD BENDELSTEIN,

Defendant.

**MEMORANDUM & ORDER**
18-CR-00309 (HG)

**HECTOR GONZALEZ**, United States District Judge:

Defendant Harold Bendelstein was charged with one count of participating in a scheme to

commit healthcare fraud, in violation of 18 U.S.C. § 1347, and two counts of submitting a false

claim to a department or agency of the United States, in violation of 18 U.S.C. § 287.  ECF No.

1.  The jury returned a verdict of guilty with respect to the healthcare fraud charge and one of the

false claim charges and acquitted Defendant of the other false claim charge.  ECF No. 118.  After

trial, Defendant renewed his motion for a judgment of acquittal that he made during trial,

pursuant to Rule 29 of the Federal Rules of Criminal Procedure, and, alternatively, moved for a

new trial, pursuant to Rule 33.  *See* ECF No. 124.  For the reasons set forth below, the Court

denies Defendant's motions.

**I.      Defendant's Motion for a Judgment of Acquittal**

A defendant using a Rule 29 motion to challenge the sufficiency of the evidence "bears a

heavy burden" and faces a standard of review that "is exceedingly deferential" to the

Government.  *United States v. Gahagen*, 44 F.4th 99, 108 (2d Cir. 2022).[1]  "A jury verdict must

be upheld if, after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable

---

[1]      Unless noted, case law quotations in this order accept all alterations and omit all internal
quotation marks, citations, and footnotes.

doubt." *Id.* (emphasis in original).  When viewing the evidence, the Court must "defer to the

jury's assessment of witness credibility." *Id.*  The Court must "assess the evidence as a whole"

rather than "evaluate the evidence piecemeal or in isolation."  *United States v. Connolly*, 24 F.4th

821, 832 (2d Cir. 2022).  "'[T]he Government need not negate every theory of innocence.'"

*United States v. Nordlicht*, No. 16-cr-640, 2022 WL 1469393, at *2 (E.D.N.Y. May 10, 2022)

(quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).  "If the [C]ourt concludes

that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the

[C]ourt must let the jury decide the matter."  *United States v. Landesman*, 17 F.4th 298, 319 (2d

Cir. 2021).

However, the Court may not permit the jury to convict a defendant based on "[s]pecious

inferences . . . because it would not satisfy the Constitution to have a jury determine that the

defendant is *probably* guilty."  *Id.* at 320 (emphasis in original).  This is especially true when the

Government seeks to prove through inferences a fact that "is also an element of the offense."  *Id.*

In those circumstances, "it is not enough that the inferences in the [G]overnment's favor are

permissible, but rather, the [C]ourt must also be satisfied that the inferences are sufficiently

supported to permit a rational juror to find that the element, like all elements, is established

beyond a reasonable doubt."  *Id.*  Although "[d]irect evidence is not required" and "the

[G]overnment is entitled to prove its case solely through circumstantial evidence," the Court

must nevertheless ensure that the Government has "demonstrate[d] each element of the charged

offense beyond a reasonable doubt."  *Id.*

### A.    The Evidence Was Sufficient to Identify the Defendant as Dr. Harold Bendelstein

Defendant argues that the Government did not present sufficient evidence to identify the

Defendant who appeared in court as the person whom the Government charged.  ECF No. 124 at

4–6.  Defendant is not arguing that there is insufficient evidence to demonstrate that a doctor named Harold Bendelstein submitted allegedly fraudulent transactions to Medicare and Medicaid.  To address that point, the Government introduced exhibits linking the challenged transactions to a unique identifier used by Medicare and Medicaid, known as a "National Provider Identifier," that was specifically assigned to Harold Bendelstein.  *See* GX 200; GX 250.  In both of those exhibits, Defendant provided an address in Far Rockaway for receiving correspondence and identified an address on Kings Highway in Brooklyn as one of the locations where he saw patients.  *Id.*  Defendant is instead arguing that even if the paperwork put into evidence by the Government proved that a doctor named Harold Bendelstein committed a crime, there is insufficient proof to demonstrate that the Defendant who stood trial is the same person.  *See* ECF No. 124 at 4–6.

The evidence admitted at trial was sufficient to demonstrate that the Defendant who appeared in court is the Harold Bendelstein charged in the indictment.  Defendant cites a single case as support for his lack-of-identification argument, *United States v. Dupre*, No. 04-cr-267, 2004 WL 2914075 (S.D.N.Y. Dec. 15, 2004).  *See* ECF No. 124 at 4–6.  However, the court in that case expressly said that "an in-court identification of a defendant by a witness is not required for a conviction."  *Dupre*, 2004 WL 2914075, at *4 (denying motion for judgment of acquittal), *aff'd*, 462 F.3d 131 (2d Cir. 2006) (affirming conviction without addressing identification issue on appeal and remanding for re-sentencing).  Instead, the trial evidence need only be "sufficient to permit the inference that the person on trial was the person who committed the crime."  *Id.*  One example of permissible indirect evidence, which *Dupre* described as "eloquent and sufficient proof of identity," is "if witnesses who have met the defendant and could potentially identify her in court fail to point out that the wrong person has been brought to trial."  *Id.*

3

First, there was sufficient evidence for the jury to conclude beyond a reasonable doubt that the Defendant who appeared at trial was Harold Bendelstein because, as discussed in greater detail in Section II.B below in connection with Defendant's *Brady* challenge, Defendant's counsel entered into a stipulation that identified Defendant by name as "Dr. Harold Bendelstein." Trial Tr. 521:20–522:3 (indicating that the stipulation was "agreed by and between Ryan Poscablo, counsel for Dr. Harold Bendelstein and Andrew Estes on behalf of the United States of America"). This stipulation alone was sufficient to identify Defendant.

Second, Defendant introduced exactly the type of reputation and opinion evidence that the court in *Dupre* said is sufficient for a jury to identify a defendant by inference. Defendant called as a witness the rabbi of the synagogue in Far Rockaway that Defendant attends, who testified that he knew "Dr. Bendelstein" for 45 years, that their wives are sisters, and that they have "spent a tremendous amount of time together." Trial Tr. 672:21–673:13. Defendant also called as witnesses a neighbor from Far Rockaway who had known Defendant for more than 25 years and an emergency room physician who worked at a hospital in Far Rockaway where Defendant sometimes treated patients, both of whom testified that they knew "Dr. Bendelstein." Trial Tr. 682:3–24, 688:8–689:7. Despite providing positive reputation and opinion evidence about Dr. Bendelstein, none of these witnesses said that the person sitting in Defendant's chair was not the Dr. Bendelstein that they knew.

Since Defendant's counsel referred to his client during his opening statement as "Dr. Harold Bendelstein," *see* Trial Tr. 41:6–14, Defendant's counsel concedes in their reply brief that they "do[] not deny" that "the person sitting next to defense counsel" during trial "[wa]s a doctor named Harold Bendelstein," *see* ECF No. 126 at 9. Defendant is therefore further arguing that the evidence allowed for a reasonable doubt that a different doctor named Harold

4

Bendelstein may have inadvertently been brought to trial.  However, Defendant introduced evidence that specifically connected the person who appeared at trial with the Dr. Harold Bendelstein who treated the patients whom the Government called as witnesses.  Defendant called as an expert witness Dr. Cosetti, an otolaryngologist from Mount Sinai, who testified about the nature of the treatment received by several of the Government's witnesses.  *See, e.g.*, Trial Tr. 796:5–798:1.  As part of her testimony, Dr. Cosetti used annotated versions of Dr. Bendelstein's records for these patients, and she explained that she created these notes after reviewing other notes provided by an unnamed "family member" of Dr. Bendelstein, which helped her to interpret Dr. Bendelstein's handwriting on the original records.  Trial Tr. 781:3–18, 824:22–828:7.  It would make no sense for a family member of the Dr. Harold Bendelstein who appeared at trial to have been able to assist with interpreting the handwriting in medical records created by the Dr. Harold Bendelstein who treated the patients at issue in the Government's charges.  Nor would it make any sense, if a different Dr. Harold Bendelstein had treated those patients, for one of that man's family members to have assisted with the defense of the Dr. Harold Bendelstein who appeared at trial.  The only plausible explanation for the family assistance described in Dr. Cosetti's testimony is that the same Dr. Harold Bendelstein both appeared at trial and created those medical records.

Finally, the testimony provided by the patient witnesses was sufficient for the jury to conclude, by inference but beyond a reasonable doubt, that the patients saw the same Dr. Bendelstein who appeared at trial.  The husband of Carol Tannenbaum, whose treatment was the subject of the false claims charge for which Defendant was convicted, accompanied Ms. Tannenbaum to her appointment and testified that the appointment occurred at an office on Kings Highway.  Trial Tr. 138:11–22.  Two other patients similarly testified that they received

their treatment at an office on Kings Highway.  Trial Tr. 195:9–17, 315:18–22.  During cross-examination, Defendant's counsel expressly asked whether one of these patients "visited Dr. Bendelstein" and received an affirmative answer.  Trial Tr. 321:12–13.  Defendant's counsel similarly asked Mr. Tannenbaum whether his wife's visit "with Dr. Bendelstein" was unremarkable and received an affirmative answer.  Trial Tr. 144:12–14.  Based on this testimony, and the billing paperwork that the Government introduced, Defendant is arguing that the jurors could have harbored a reasonable doubt about whether there are two different Dr. Harold Bendelsteins who both practice on Kings Highway and live in Far Rockaway—one who treated the patients who testified and one who appeared at trial.  As a matter of law, this does not rise to the level of a reasonable doubt sufficient to enter a judgment of acquittal, and the jury sensibly rejected Defendant's invitation in his counsel's closing argument to acquit Defendant on all charges due to the Government's failure to identify him.  *See* Trial Tr. 932:9–16.

### B.    The Evidence Was Sufficient to Convict Defendant of the False Claim Charge

Defendant was charged with two counts of submitting false claims, both of which were related to billing Medicare for medical services using a specific billing code, known as CPT code 69020.[2]  The charge for which Defendant was convicted related to a patient named Carol Tannenbaum, and the charge for which Defendant was acquitted related to a patient named Roza Fursova.  Defendant's argument that the evidence was insufficient to convict him of submitting a false claim hinges on two points:  (i) that CPT code 69020 is a permissible code to use for a procedure known as an "ear debridement," and (ii) that the evidence does not permit the jury to conclude beyond a reasonable doubt that Defendant did not perform an ear debridement on any of the patients at issue, particularly Ms. Tannenbaum.  *See* ECF No. 124 at 6.

---

[2]    CPT is an abbreviation that means "Current Procedure Terminology."  Trial Tr. 52:3–5.

The jury could reasonably have convicted Defendant of submitting a false claim for Ms. Tannenbaum by rejecting Defendant's first point.  The jurors could have credited the testimony of Dr. McKinney, a family medicine doctor who had performed dozens of incision and drainage procedures on patients' ear canals, who testified:  (i) that CPT code 69020 is designed for claims related to such incision and drainage procedures; (ii) that an incision and drainage procedure is not the same as an ear debridement; and (iii) that procedures that do not exactly match an existing CPT code should be billed using a separate "miscellaneous code."  Trial Tr. 69:13–18, 72:4–8, 75:11–76:15, 83:14–84:2.  Based on this testimony, the jury could have concluded that using CPT code 69020 was not a correct manner to submit a claim for an ear debridement.

One of Defendant's expert witnesses, Dr. Cosetti, testified that CPT code 69020 is one of multiple proper potential codes to use for an ear debridement.  Trial Tr. 808:19–812:9.  She was the only doctor who testified to that effect.  But even Dr. Cosetti admitted that she had never used CPT code 69020 for an ear debridement despite performing as many as five to ten ear debridements a day throughout her career.  Trial Tr. 777:19–23, 810:25–811:9, 816:14–25.  Accordingly, the jury was entitled to assign little weight to Dr. Cosetti's testimony about the proper use of CPT code 69020, to credit instead the testimony of Dr. McKinney, and thereby to conclude that CPT code 69020 is meant to be used only for an incision and drainage procedure related to the ear.

Alternatively, the jurors could have rejected Defendant's second assertion and concluded that, even if CPT code 69020 is a proper code to use for claims related to an ear debridement, Defendant did not, in fact, perform an ear debridement on Ms. Tannenbaum.  Such a conclusion appears consistent with the jury's verdict of acquittal with respect to Defendant's claim for Ms. Fursova, whose contemporaneous medical records for her visit noted that Defendant "debrided

and cleared" a "mild abscess," and the jury's guilty verdict with respect to Defendant's claim for

Ms. Tannenbaum, whose medical records contained no similar notation.  *See* Trial Tr. 863:23–

864:19.[3]  Instead, Ms. Tannenbaum and her husband testified that the only material Defendant

removed from her ear was earwax.  Trial Tr. 139:8–140:5, 152:17–154:24.  Dr. McKinney

explained that there is a separate CPT code for claims related to earwax removal, and the jury

could have concluded from his testimony that CPT code 69020 is not a proper code for earwax

removal—and therefore not a proper code for the services that Defendant performed for Ms.

Tannenbaum.  Trial Tr. 83:3–12.

If the jurors concluded that Defendant submitted claims for ear debridements in instances

when he never performed an ear debridement, then they could easily have concluded that

Defendant had the knowledge sufficient to convict him of having submitted a false claim.

Alternatively, if the jurors concluded that it was not proper to use CPT code 69020 when billing

for an ear debridement, they still could have concluded beyond a reasonable doubt that

Defendant possessed the requisite knowledge because of a letter that he received from Safeguard

Services, a private contractor responsible for performing audits for Medicaid and Medicare

claims.  *See* Trial Tr. 402:16–403:3 (explaining that Safeguard Services' letter was dated

September 15, 2016); Trial Tr. 805:12–17 (explaining that Ms. Tannenbaum's visit occurred in

December 2017).  The jurors could have interpreted the letter to mean that Medicare and

---

[3]     When interpreting Defendant's medical records for Ms. Tannenbaum's visit, Dr. Cosetti testified that Ms. Tannenbaum's right ear had "necrotic debris" and that "[t]he treatment was that [she] would need debridements and that [she] should follow up in two months."  Trial Tr. 806:25–807:5.  Dr. Cosetti agreed with Defendant's counsel that "an ear debridement [would] be an appropriate procedure for this presentation," but she did not testify that the medical records indicated that Defendant had actually performed a debridement during that visit.  Trial Tr. 807:6–11.  Ms. Tannenbaum and her husband both testified that the doctor she saw never asked her to return for a follow-up visit.  Trial Tr. 141:24–142:5, 154:19–20.

8

Medicaid did not consider it proper for Defendant to use CPT code 69020 for the removal of necrotic tissue—meaning that they did not consider it a proper code for an ear debridement—and that the letter put Defendant on notice of Medicare's and Medicaid's position on that issue.  *See* Trial Tr. 403:12–405:5.  The Second Circuit has recently affirmed a defendant's conviction for making a false claim to the Internal Revenue Service, in violation of 18 U.S.C. § 287, after receiving a notice from the Internal Revenue Service that his tax position "was frivolous." *United States v. Young*, 832 F. App'x 748, 750 (2d Cir. 2020) (affirming denial of motions made pursuant to Rules 29 and 33).

### C.    The Evidence Was Sufficient to Convict Defendant of a Scheme to Defraud

Based on the evidence described in the previous section, the jurors could have reasonably concluded either:  (a) that Defendant knew that CPT code 69020 was not a permissible billing code for ear debridements, or (b) that Defendant submitted claims for purported ear debridements using CPT code 69020 without actually performing ear debridements.  The jury could reasonably have concluded that, despite knowing one of these two things, Defendant submitted improper claims using CPT code 69020 for other patients in addition to Ms. Tannenbaum.

Multiple other patients testified during the trial, and although Defendant argues that each of their descriptions of their visits was consistent with having received an ear debridement, *see* ECF No. 124 at 7–8, the jury could reasonably have reached the opposite conclusion—and certainly could have concluded that none of these patients received an incision and drainage procedure.  To the extent that Defendant is attacking the credibility or accuracy of these patients' recollections, as he did during the Rule 29 motion he made during trial, the Court may not enter a judgment of acquittal based on its own assessment of witness credibility.  *United States v.*

*Nekritin*, No. 10-cr-491, 2012 WL 37536, at *6 (E.D.N.Y. Jan. 9, 2012) (refusing to grant judgment of acquittal for healthcare fraud charge based on arguments that patients' testimony "was inherently unreliable" due to "the patients' age, language, and the time elapsed since their last treatment").

The Government also introduced evidence that Defendant submitted significantly more claims to Medicare and Medicaid using CPT code 69020 than any other doctor in New York and several other nearby states. The jury could have reasonably inferred from this evidence, in addition to the testimony of Defendant's patients, that there was no reasonable doubt that Defendant was submitting improper claims using that code. *See United States v. Mathieu*, No. 16-cr-763, 2019 WL 4267539, at *1, *3 (S.D.N.Y. Sept. 10, 2019) (denying judgment of acquittal for healthcare fraud charges where "peer comparison data" introduced at trial demonstrated that defendant "was the top-ranked prescriber" of a particular medical product "in the state of New York"), *aff'd*, 853 F. App'x 739, 742 (2d Cir. 2021) (affirming denial of separate motion for new trial).

## II.   Defendant's Motion for a New Trial

### A.   The Weight of the Evidence Does Not Require a New Trial

The Court may not grant a new trial "based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict." *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020). The Court "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Id.* Although Rule 33 allows the Court to weigh the evidence and make credibility determinations, it should grant a motion for a new trial based on witness credibility "only where testimony is patently incredible or defies physical realities." *United States v. Bimbow*, No. 21-cr-48, 2022 WL 1617490, at *4 (S.D.N.Y. May 23, 2022) (denying motion for new trial). Based on the evidence described in connection

10

with Defendant's motion for a judgment of acquittal, the Court does not find that the trial evidence preponderates heavily against the jury's verdict.

### B.   The Government's Purported *Brady* Violations Do Not Merit a New Trial

As described above, the Government introduced into evidence a letter from Safeguard Services, which the Government asserted put Defendant on notice that his use of CPT code 69020 was improper.  When the Government interviewed the witness who authenticated that letter shortly before trial, the Government disclosed learning during the interview that Safeguard Services' files related to Defendant contained a note that Defendant called Safeguard Services to inquire about the letter.  *See* ECF No. 124-1 at 2.  Defendant argues that the Government violated its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny by not producing Safeguard Services' full investigative file, particularly any notes related to Defendant's call.  ECF No. 124 at 11–12.

A *Brady* violation may be grounds for granting a motion for a new trial, but "not all instances of governmental nondisclosure violate *Brady*, or warrant such relief."  *United States v. Hunter*, 32 F.4th 22, 30 (2d Cir. 2022).  "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.  In other words, true *Brady* material must be (1) favorable, (2) suppressed, and (3) prejudicial."  *Id.* at 30–31.

A prosecutor's disclosure obligations under *Brady* do not apply only to information directly in the prosecutor's possession.  "[T]he fact that the prosecutor has a monopoly on potentially material information prior to its disclosure imposes a further burden:  the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the

11

government's behalf in the case . . . ." *Id.* at 35.  However, the Second Circuit "ha[s] long rejected the notion that knowledge of any part of the government is equivalent to knowledge on the part of the prosecutor." *Id.*  Instead, a prosecutor only "has a duty . . . to learn information when that information is possessed by others on the prosecution team." *Id.* at 36.  To determine whether other people affiliated with the government were members of the "prosecution team," a court must examine "what the person *did*" to assist in prosecuting the defendant, not merely "who the person *is*." *Id.* (emphases in original).  This means that a person's status as a member of the prosecution team is not dictated entirely by their "status" within the government, "such as a law enforcement officer, prosecutor or other government official," or by the "bureaucratic proximity" between the prosecutors assigned to a case and the government agency that allegedly possessed *Brady* material.  *Id.* at 36, 37 (emphasis omitted).

District courts within the Second Circuit have used various factors to decide whether other government personnel should be considered members of the prosecution team.  "Where a *Brady* claim is premised on another agency or office's possession of alleged exculpatory material, a defendant must show that the two offices or agencies were engaged in a joint investigation." *United States v. Avenatti*, No. 19-cr-373, 2022 WL 394494, at *10 (S.D.N.Y. Feb. 9, 2022).  "In assessing whether two offices or agencies engaged in a joint prosecution, courts consider a number of factors, including whether the other agency:  (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *Id.*

The Government did not commit a *Brady* violation with respect to Safeguard Services' files because Safeguard Services was not part of the prosecution team, and therefore the Government did not suppress the information that Safeguard Services had.  Although Safeguard Services may have initiated an investigation into Defendant's billing practices before the U.S. Department of Justice did, Defendant has not shown that the factors described above apply to Safeguard Services and therefore has not demonstrated that it was a part of the prosecution team. Even a heavily regulated private entity, or a private entity that otherwise has a close relationship with the government, does not fall within the scope of the prosecution team's *Brady* obligations. *See United States v. Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (denying motion to compel, pursuant to Rule 16, disclosure of information possessed by the New York Stock Exchange).  "The mere fact that the Government may have requested and received documents from [Safeguard Services] in the course of its investigation does not convert the investigation into a joint one . . . ."  *Id.*

The Government's openness about the limits of its production of information possessed by Safeguard Services, combined with Defendant's own knowledge of his phone call with Safeguard Services, further demonstrate that information related to that call was not suppressed. *See Rigas v. United States*, 848 F. App'x 464, 465 (2d Cir. 2021) (denying motion to vacate conviction, pursuant to 28 U.S.C. § 2255, because "no *Brady* violation occurs if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence").  The Government informed Defendant that it was producing only documents from Safeguard Services in the prosecutors' direct possession—rather than all documents related to Defendant in Safeguard Services' possession—and further stated that it had no objection to Defendant serving a subpoena on Safeguard Services for additional records.  *See*

ECF No. 124-2; ECF No. 133-1.  Judge Sterling Johnson, who was presiding over Defendant's case at the time, also invited Defendant to submit proposed subpoenas to any private contractors for Medicare or Medicaid, such as Safeguard Services.  ECF No. 135; *see also* ECF Minute Entry dated Dec. 5, 2019.

Since Defendant knew about his own phone call with Safeguard Services, Defendant could have submitted a subpoena requesting any records of that call or other relevant information in Safeguard Services' files.  *See United States v. Brennerman*, 818 F. App'x 25, 29–30 (2d Cir. 2020) (holding that no *Brady* violation occurred because "[t]he government insist[ed] that every document it received from [a private entity] was turned over to [defendant]" and defendant "never sought a subpoena pursuant to Federal Rule of Criminal Procedure 17" to obtain allegedly exculpatory "notes" in the possession of that entity).  Although Defendant argues that such a subpoena would not have been permitted under Rule 17, *see* ECF No. 133, his position is contrary to the positions stated by both the Court and the Government at the relevant time.

The Court rejects Defendant's attempt to argue that the Second Circuit's decision in *United States v. Pikus*, 39 F.4th 39 (2d Cir. 2022), which was an appeal in another healthcare fraud case in which Judge Johnson presided over pretrial proceedings, conclusively held that materials in the possession of Safeguard Services or other contractors working for Medicare or Medicaid fall within the Government's *Brady* obligations.  *See* ECF No. 126 at 2–3.  The Second Circuit's decision was based on issues related to the Speedy Trial Act and expressly stated that it "d[id] not address" whether documents possessed by Safeguard Services "constituted *Brady* material, or whether [defendant] was entitled to them over the Government's objection."  *Pikus*, 39 F.4th at 57 n.15.  To the extent that Judge Johnson told the defendant in *Pikus* during a conference in December 2016 that he could not serve a Rule 17 subpoena on Safeguard Services

because the defendant's proposed subpoena "appear[ed] to be asking for *Brady* material," *see id.*
at 45, Dr. Bendelstein and his counsel were not entitled to rely on that supposed ruling because
Judge Johnson told them the opposite during their later conference in December 2019 and
instead invited them to submit a proposed subpoena. *See* ECF No. 135; ECF Minute Entry dated
Dec. 5, 2019. Judge Johnson was free to adjust his position on this issue during the intervening
three years in the absence of binding, contrary Second Circuit authority, which the decision in
*Pikus* demonstrates did not exist.

In addition to Defendant's failure to prove that information possessed by Safeguard
Services was suppressed, Defendant has also failed to show that he was prejudiced by the
purported non-disclosure, as is required to demonstrate a *Brady* violation. Although the witness
who authenticated Safeguard Services' letter to Defendant testified that he did not know whether
Defendant called Safeguard Services in response, the parties later read the following stipulation
to the jury: "if called as a witness at trial, a representative of Safeguard Services, LLC (SGS)
would testify that the records of SGS reflect [t]hat after receiving the letter dated September 15,
2016, marked as Government Exhibit [203.1R], Dr. Harold Bendelstein [then] contacted SGS via
telephone." Trial Tr. 521:20–522:3. This is the exact evidence that Defendant claims was
exculpatory, *see* ECF No. 124 at 14, and Defendant's counsel argued during his summation that
Defendant's follow-up call was exculpatory, *see* Trial Tr. 962:14–22. To the extent that
Defendant seeks other unspecified information in Safeguard Services' files, Defendant's motion
makes no showing that the information would have been favorable to Defendant. *See* ECF No.
124 at 14.

Defendant also asserts in a footnote that he is entitled to a new trial because the
Government committed a *Brady* violation by not producing transcripts of the grand jury

testimony of one of its agents who interviewed Ms. Tannenbaum.  ECF No. 124 at 12 n.4.

Defendant previously moved on the eve of trial to compel the production of the agent's grand

jury testimony both on the basis that Defendant was entitled to the material under *Brady* and on

the basis that the agent supposedly perjured himself before the grand jury.  The Court denied that

motion orally during a break in the jury selection proceedings.  *See* Jury Selection Tr. (June 28,

2022) 6:1–7:3, 254:2–16.

Defendant asserted in his prior motion that he was entitled to the agent's grand jury

testimony under *Brady* because the agent testified during a suppression hearing that he told the

grand jury that he had never interviewed Ms. Tannenbaum and instead had interviewed only her

husband.[4]  ECF No. 108 at 6; *see* ECF No. 44 at 52:7–9 (transcript of suppression hearing

testimony during which the agent testified that he "told the grand jury" that he met with Ms.

Tannenbaum's "husband").  Defendant argued that, to the extent the agent accurately described

his grand jury testimony, a transcript of that testimony would be *Brady* material either because it

would undermine the accuracy of any information conveyed to the Government about

Defendant's treatment of Ms. Tannenbaum or because Defendant could potentially use the

testimony to impeach any witness who might testify at trial that the agent spoke directly with

Ms. Tannenbaum.  ECF No. 108 at 6–7.

The Government's non-disclosure of the agent's grand jury testimony was not a *Brady*

violation because the grand jury transcript would have been "cumulative, and hence not

material" in light of the Government's extensive disclosures related to the circumstances under

---

[4]      Defendant previously moved to suppress statements that he made during a proffer session
with the Government prior to being charged.  *See* ECF No. 22.  Magistrate Judge Tiscione held
multiple evidentiary hearings to address that motion, *see* ECF Nos. 44 & 69, and Judge Johnson
adopted his recommendation that the motion to suppress be denied, *see* ECF Nos. 71 & 72.

which the agent interviewed Mr. and Ms. Tannenbaum.  *See United States v. Rowland*, 826 F.3d 100, 113 (2d Cir. 2016) (holding that prosecutors' failure to produce additional notes taken during interview of a government witness was not a *Brady* violation because they produced a memorandum summarizing the interview and other relevant information).  The Government produced to Defendant, pursuant to 18 U.S.C. § 3500, documents related to the agent's interviews with Mr. and Ms. Tannenbaum, which Defendant's counsel used at trial both to cross-examine Mr. Tannenbaum when the Government called him as witnesses and to examine the agent when Defendant called the agent as one of his own witnesses.  Trial Tr. 143:4–144:6, 493:9–497:7.[5]  During Defendant's counsel's examination of the agent, he testified, consistent with the Government's production of documents, that he twice interviewed only Mr. Tannenbaum prior to the filing of the indictment and had a phone call with both Mr. and Ms. Tannenbaum approximately two weeks before trial commenced.  Trial Tr. 493:9–497:7.  These disclosures and the agent's trial testimony rendered immaterial any testimony that the agent gave to the grand jury about his interviews with Mr. and Ms. Tannenbaum.  *See United States v. Booker*, 825 F. App'x 4, 11 (2d Cir. 2020) (holding that alleged *Brady* violation was not material because prosecutors' disclosure of notes from witnesses' "proffer sessions" gave defendant "all the information necessary to impeach the witnesses when they testified").

### C.   The Court's Evidentiary Rulings Do Not Merit a New Trial

When considering a motion for a new trial, the Court must "keep[] in mind that the ultimate test . . . is whether letting a guilty verdict stand would be a manifest injustice."  *United*

---

[5]     Since only Defendant called the agent as a witness and the Government did not, the Government was not required to produce the agent's grand jury testimony pursuant to 18 U.S.C. § 3500, which applies to the production of prior statements made by only "a witness called by the United States [who] has testified on direct examination," or Rule 26.2, which authorizes "a party who did not call the witness" to compel the production of prior statements by that witness. *See* 18 U.S.C. § 3500(b); Fed. R. Crim. P. 26.2(a).

*States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018).  Accordingly, when a defendant's motion for

a new trial is based on the Court's evidentiary rulings, the relevant inquiry is not whether those

evidentiary rulings were wrong but whether their effect amounted to a "manifest injustice."

*United States v. Aiyer*, 470 F. Supp. 3d 383, 410 (S.D.N.Y. July 6, 2020) (stating that arguments

about evidentiary rulings "are improper on a Rule 33 motion absent manifest injustice"), *aff'd*,

33 F.4th 97 (2d Cir. 2022).  For the reasons described in this section, the evidentiary rulings that

Defendant challenges were correct and certainly did not rise to the level of the manifest injustice

necessary to obtain a new trial.

      One theory that Defendant pursued at trial was that the Government agent who

interviewed many of the Government's witnesses while investigating the case and preparing for

trial conducted his interviews in an improperly leading manner.  Essentially, Defendant sought to

show that the agent "seeded" the Government's witnesses with information that they otherwise

would not have provided—supposedly by explaining that the agent was investigating Defendant

for fraud and suggesting that Defendant had provided or billed for his medical services

improperly.  *See* ECF No. 124 at 17.  The Court permitted Defendant to develop this theory at

trial by both:  (i) cross-examining the Government's patient witnesses about the manner in which

they were interviewed, and (ii) calling the Government agent as Defendant's own witness to

examine him about the manner in which he conducted the interviews.

      The agent denied conducting the interviews in a suggestive or misleading manner.  Trial

Tr. 491:19–493:2.  Defendant then attempted to call as a witness one of Defendant's patients,

whom the Government interviewed but did not call as a witness.  Defendant's counsel proffered

that this patient would testify that the agent interviewed her in the misleading manner that the

agent disavowed during his testimony.  Trial Tr. 509:15–514:25.

The Court properly ruled that Defendant's counsel could not question this patient about whether the manner in which the agent interviewed her was inappropriately leading.  The Court provided Defendant with ample opportunity to attack the integrity of the aspects of the Government's investigation that were relevant to the proof it submitted at trial.  Examining other Government interviewees, who did not testify, about the integrity of their interviews would have no direct relevance to the integrity of the Government's trial evidence and would have only served to impeach the agent's testimony that he conducted all of his interviews properly.  Such testimony therefore would have passed into the realm of "[e]xtrinsic evidence offered for impeachment on a collateral issue" and, therefore, was properly excluded.  *United States v. Purdy*, 144 F.3d 241, 245–46 (2d Cir. 1998) (affirming exclusion of testimony of a government agent that was designed both to contradict the testimony of another government witness and to "impugn[] the integrity of the prosecution's case").

Rule 608(b) prohibited using the interviewee's testimony as a means of impeaching the agent's character for truthfulness.  *See* Fed. R. Evid. 608(b).  But excluding her testimony was still proper even if it was designed directly to contradict the agent's assertion that he conducted his investigation properly.  *United States v. Watts*, No. 10-cr-627, 2013 WL 5423748, at *28 (E.D.N.Y. Sept. 26, 2013).  A "witness may not be impeached by extrinsic evidence (contradiction by another witness or evidence) on a collateral issue" even if the extrinsic evidence does not fall within the categorical prohibition of Rule 608(b).  *Id.* (holding that exclusion of witness offered for such purposes did not require granting a new trial).

Defendant disputes that the quality of the Government's investigation is a collateral issue.  *See* ECF No. 126 at 7–8.  Although attempting to undermine the quality of the Government's investigation is a permissible defense strategy, the lengths to which a defendant may go in

19

mounting such an attack have limits. *See Bimbow*, 2022 WL 1617490, at *4 (adhering, on Rule

33 motion, to prior decision precluding defendant from calling government agents to "attack[]

the investigation's methods"). Defendant moved into the realm of collateral issues once he

shifted from attacking the investigatory methods that produced the evidence the Government

offered at trial to attacking the investigatory methods that produced potential evidence the

Government decided not to offer.

The Court also correctly admitted the Government's evidence related to Medicare and

Medicaid claims, which were business records exempt from the rule against hearsay pursuant to

Rule 803(6). Some of this data was admitted based on a Rule 902(11) certification, and other

data was admitted through witness testimony. With respect to the data admitted through

certification, it was not improper for the Government to provide its certification on the first day

of jury selection because the Government had only recently learned that the witness who had

intended to testify about the data had become unavailable to testify. *See United States v. Rom*,

528 F. App'x 24, 26–27 (2d Cir. 2013) (holding that disclosure of Rule 902(11) certification

"two days before trial, but only one day after the government received the records" complied

with "[t]he reasonable notice requirement" of the rule).[6] This short notice was made all the more

reasonable by the fact that Defendant long had copies of the underlying data and knew that it

would be key evidence in the Government's case. Alternatively, even if the Government's

certification was defective, the Court properly admitted the data using Rule 807's residual

---

[6] The district court docket in *Rom* further reveals that the Government's disclosure of the
certification two days before trial actually occurred approximately three weeks after jury
selection. *United States v. Rom*, No. 10-cr-146 (D. Vt. Jan. 3, 2012) (ECF No. 52).
Accordingly, the fact that the Government in Defendant's case disclosed its planned certification
during jury selection does not make this case distinguishable from *Rom* because the certificate
was still disclosed before the trial began.

exception as an alternative basis.  *See United States v. Arrington*, No. 15-cr-33, 2022 WL 6662186, at *5–7 (W.D.N.Y. Oct. 11, 2022) (admitting business records pursuant to Rule 807 when government's "near miss" in complying with Rule 902's certification requirements did not undermine the reliability of the underlying records).  With respect to the evidence that was admitted by witness testimony, the Second Circuit has previously held that a witness from Safeguard Services, as a Medicare contractor, can testify to the business records status of claims data, even though Safeguard Services receives the underlying data from Medicare.  *See United States v. Kuthuru*, 665 F. App'x 34, 39 (2d Cir. 2016) (affirming conviction for healthcare fraud, in violation of 18 U.S.C. § 1347, and affirming denial of motions for judgment of acquittal and for a new trial).

Defendant also fails in his assertion that the letter from Safeguard Services, described extensively above, was improperly authenticated.  To authenticate a document, Rule 901 requires only that the offering party "produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  "Once this minimal standard is met, 'the other party then remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the *weight* of the evidence—not to its *admissibility*.'"  *United States v. Maxwell*, No. 20-cr-330, 2021 WL 5868120, at *1 (S.D.N.Y. Dec. 9, 2021) (quoting *United States v. Chin*, 371 F.3d 31, 38 (2d Cir. 2004)) (emphases in original).  Richard Gazzano, as an investigator employed by Safeguard Services, was more than capable of supplying the minimal information necessary to identify the letter as a document retrieved from Safeguard Services' file for Defendant.  *See* Trial Tr. 399:13–400:16.  The jury was free to discount or disregard the remainder of his testimony that purported to interpret the letter, *see* Trial Tr. 400:17–405:5, because of Mr. Gazzano's

21

relative non-involvement with the investigation into Defendant, for the reasons explained in

Defendant's motion, *see* ECF No. 124 at 23.

The Court also properly admitted the Government's data that purported to show that,

relative to other physicians in the state and region, Defendant was an outlier with respect to the

frequency that he submitted claims using CPT code 69020.  The Second Circuit has recently

approved the use of "peer comparison evidence," along with other evidence demonstrating that

the defendant "was the top-ranked prescriber" of a particular medical product, because it

"tend[ed] to prove the fraudulent scheme" for which the defendant was charged.  *United States v.*

*Mathieu*, 853 F. App'x 739, 742 (2d Cir. 2021) (affirming denial of Rule 33 motion for new

trial).  Another judge in this District has also admitted similar peer comparison evidence about

the use of certain CPT codes, which, in that case, showed that "the number of claims Defendant

submitted for certain types of surgeries vastly exceeded the number of claims submitted by other

physicians throughout the country for those same surgeries."  *United States v. Ahmed*, No. 14-cr-

277, 2016 WL 8732355, at \*10–11 (E.D.N.Y. June 24, 2016) (denying defendant's motion *in*

*limine* to exclude such evidence).  The fact that the Government's data included doctors whose

practices, patient mix, and billing habits may have differed from Defendant's did not render it so

prejudicial that it needed to be excluded; instead, Defendant was permitted to attack these

potentially distinguishing factors through cross-examination and did address some of them.  *See*

Trial Tr. 297:14–299:18, 379:5–25, 385:2–386:3, 394:9–20.

The Government's charts summarizing Defendant's billing claims submitted for certain

patients who testified at trial were also properly admitted.  Although Defendant asserts that the

charts were improperly argumentative, he notably "does not contend that anything included in

the charts was false."  *United States v. Parnas*, No. 19-cr-725, 2022 WL 669869, at \*7–8

22

(S.D.N.Y. Mar. 7, 2022) (holding that summary charts were properly admitted pursuant to Rule 1006 and denying motion for new trial).  The Second Circuit "has long approved the use of charts in complex trials, and has allowed the jury to have the charts in the jury room during its deliberations, so long as the judge properly instructs the jury." *United States v. Ho*, 984 F.3d 191, 210 (2d Cir. 2020) (affirming conviction and declining to order new trial).  Defendant made no objection to the manner in which the Court instructed the jurors about their potential consideration of summary charts, which both sides introduced at trial.  *See* Trial Tr. 708:19–713:23.

Finally, the Court properly excluded Defendant's proposed charts that showed how the reimbursement rate for claims submitted using CPT code 69020 changed over time relative to other codes that Defendant contended were potentially permissible to use for ear debridements. Some of the data in Defendant's exhibit pre-dated the time period covered by the indictment by nearly 15 years.  Whether the different billing rates would have incentivized Defendant impermissibly to use CPT code 69020 for an ear debridement in 2004 has little to do with whether it was fraudulent for Defendant to do so in 2014.  *See United States v. Nekritin*, No. 10-cr-491, 2011 WL 2462744, at *5 (E.D.N.Y. June 17, 2011) (excluding evidence of certain billing practices in healthcare fraud case because "evidence that defendants engaged in other, non-fraudulent conduct is not relevant to whether the charged conduct was fraudulent").  Defendant's charts were therefore properly excluded pursuant to Rule 403 because their potential to confuse the jury substantially outweighed their probative value.

## **CONCLUSION**

For the reasons set forth above, the Court DENIES Defendant's motion for a judgment of

acquittal, pursuant to Rule 29, or, alternatively, for a new trial, pursuant to Rule 33.  *See* ECF

No. 124.

SO ORDERED.

　　　　　　　　　　　　　　　　　 */s/ Hector Gonzalez*　　　　　　
　　　　　　　　　　　　　　　　　HECTOR GONZALEZ
　　　　　　　　　　　　　　　　　United States District Judge


Dated: Brooklyn, New York
　　　　March 10, 2023